**COZEN OCONNOR**
Valerie D. Rojas (State Bar No. 180041)
*vrojas@cozen.com*
601 S. Figueroa Street, Suite 3700
Los Angeles, CA  90017
Telephone:  213.892.7900
Facsimile: 213.892.7999

Michael D. Rafalko *(Application for Pro Hac Vice to be filed)*
*mrafalko@cozen.com*
Allison B. Goldis *(Application for Pro Hac Vice to be filed)*
*agoldis@cozen.com*
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA  198103
Telephone: 215.665.4611
Facsimile: 215.372.2360
Attorneys for TRANSAMERICA LIFE INSURANCE COMPANY

# IN UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| TRANSAMERICA LIFE INSURANCE COMPANY,<br><br>*Plaintiff*,<br><br>v.<br><br>DAVIT SIMONYAN,<br><br>*Defendant*. | Case No.<br><br>**PLAINTIFF TRANSAMERICA LIFE INSURANCE COMPANY'S COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF** |

Plaintiff, Transamerica Life Insurance Company as successor by merger to Transamerica Premier Life Insurance Company (together, "Transamerica"), acting by and through its counsel, the Cozen O'Connor firm, files this complaint for damages and declaratory relief against Davit Simonyan ("Simonyan"), and in support thereof, states the following:

## PARTIES

1. Transamerica is an insurance company organized and existing under the laws of the State of Iowa with its principal place of business in Cedar Rapids, Iowa, and is therefore deemed to be a citizen of the State of Iowa.

2. Simonyan is an adult individual residing in Burbank, California, and is a citizen of the State of California.

## JURISDICTION AND VENUE

3. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, because the dispute is between citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

4. Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391(b)(1) because the Central District of California is the judicial district in which the defendant resides.

5. Venue is also proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) because the Central District of California is the judicial district in which a substantial part of the acts and omissions giving rise to Transamerica's claims against the defendant occurred.

## FACTS COMMON TO ALL COUNTS

6. This is an action in which Transamerica alleges fraud and other causes of action in connection with Simonyan's procurement of and claim for benefits under a long-term care insurance rider issued by Transamerica.

7. Specifically, Simonyan engaged in a years-long scheme to obtain the rider by artifice, then to assert a fraudulent claim for benefits thereunder. Both steps in this process were tainted by fraud.

8. First, Simonyan misrepresented and omitted known material facts in his application for coverage in order to be issued coverage that Transamerica would not have issued absent an additional investigation into the nature and severity of certain putative preexisting conditions. This was fraud.

9. Then, second, after securing coverage, Simonyan initiated and pursued a claim for benefits in which he materially misrepresented the nature and severity of certain alleged functional limitations, among other critical facts, in an attempt be paid benefits.

10. Transamerica completed a year-long claim investigation during which Transamerica performed multiple periods of surveillance. This surveillance and other information developed by Transamerica revealed not only that Simonyan is not eligible for benefits under the rider because he does not meet the benefit triggers in that coverage, but that he suffers from no functional limitation whatsoever and his claim for benefits was and is a sham in the entirety. This was fraud.

11. Although Simonyan's fraud included at least two distinct phases – the application for coverage and claim for benefits – both phases were part of a single, unified and continuous scheme. Indeed, upon information and belief, it was a *fait accompli* since before the time of his application that Simonyan would apply for coverage and, after that coverage was issued, he would assert a dubious and fraudulent claim thereunder in order to be paid benefits he was not lawfully entitled to receive.

12. Fortunately, through the diligence of its investigators, Transamerica intercepted the scheme before benefits could be paid. Transamerica has nonetheless been harmed. It devoted substantial and quantifiable time, effort and money to the underwriting and issuance of coverage tainted by fraud; it has paid significant producer commissions; it has spent tens of thousands of dollars investigating the fraud and taking remedial steps; and, most notably, it remains in contractual privity with an insured who has proven himself fundamentally incapable of proceeding in a good faith contractual relationship with Transamerica. Thus, the relief sought in this Complaint is both justified and appropriate.

### A. Simonyan's Application for Coverage

13. On or about September 19, 2017, Simonyan applied for coverage with Transamerica.

14. The specific coverage he applied for included a Flexible Premium Adjustable Life Insurance chassis, which was ultimately issued as policy No. 6600355026 (the "Policy").

15. Simonyan also applied for a Comprehensive Long-Term Care Insurance Rider (the "Rider"), which was appended to and incorporated within the Policy at issuance.

16. When he applied for the Policy and Rider, Simonyan was asked a series of specific questions about the existence and/or treatment of certain medical conditions, his functionality, his use of medical implements such as a cane or wheelchair and other issues directly material to his insurability and the overarching determination of whether Transamerica would accept the risk and issue coverage.

17. Simonyan answered all such questions in the applications in the negative, meaning he represented to Transamerica that he was not experiencing and had not been treated for a litany of medical conditions, had no functional limitations, used no medical implements and was generally insurable by Transamerica.

18. Simonyan signed the application papers thereby specifically attesting to the truth of these and other representations, then submitted the applications to Transamerica with the design and intent of being issued coverage.

**B.    The Coverage At Issue In This Action**

19. On or about October 17, 2017, acting in reliance on the representations provided by Simonyan in his applications, Transamerica issued the Policy with the Rider appended and incorporated therein. The applications were also appended to and incorporated within the Policy at issuance. A true and correct copy of the Policy (with redactions of certain Protected Health Information as defined by the HIPAA statute) is attached hereto as **Exhibit A**.

20. The Rider provides coverage for Home Health Care Services – meaning "[s]killed nursing or other professional services provided where the Insured

4

resides…" – in the event Simonyan (the Insured) meets the Rider's definition of a Chronically Ill Individual, among other requirements.

21. Chronically Ill Individual is defined in pertinent part to mean that Simonyan is "unable to perform, without Substantial Assistance from another individual, at least two of the six Activities of Daily Living" defined in the Rider ("ADLs").

22. Substantial Assistance means Hands-On or Standby Assistance – *i.e.*, assistance from another person who is physically assisting or within arm's reach of the Insured.

23. The ADLs defined in the Rider include Bathing, Continence, Dressing, Eating, Toileting and Transferring.

24. In the event Simonyan needs Hands-On or Standby Assistance from another person to perform two or more of the six ADLs defined in the Rider, the Rider will pay benefits to Simonyan provided Simonyan hires, receives care from and pays for the services of an approvable caregiver to assist with the performance of ADLs, subject to the terms and conditions of the Rider and Policy.

25. Notably, benefits under the Rider are only triggered if Simonyan incurs actual expenses for care services rendered. This means that Simonyan needs to receive care in exchange for remuneration, then submit invoices and other Proof of Loss signed and certified by both Simonyan and his caregiver to Transamerica in order for benefits to be paid.

26. The Rider includes a provision entitled "Time Limit on Certain Defenses" which in some circumstances may impact the right of an insurer to rescind coverage based on fraudulent representations in an application that are discovered by an insurer more than two years after the date on which coverage is issued. This provision, however, has no effect on the right of an insurer to seek to void coverage based on the insured's fraud in connection with a claim for benefits.

27. The Rider also includes an exclusion for coverage when care is provided by a member of the insured's Immediate Family. Immediate Family includes the insured's Spouse or Partner. Partner is defined, *inter alia*, to mean:

> An adult who is not related to the Insured by blood or marriage under the laws of the state in which this rider was issued; who has resided with the Insured continuously for at least two years; and both the Insured and Partner hold themselves out to the public as life partners.

28. The Rider additionally excludes coverage when care is provided: "for which no charge is normally made in the absence of insurance."

### C. Simonyan's Claim for Benefits Under the Rider

29. In or around May 2020, Simonyan signaled to Transamerica that he wanted to initiate a claim for benefits under the Rider.

30. On or about May 14, 2020, Transamerica assessed Simonyan for benefits and determined, based largely on his subjective representations to the assessor, that he was unable to perform two or more ADLs without Substantial Assistance.

31. Typically, an assessment like this would be performed in-person by a nurse or medical social worker. A remote assessment was necessary in this instance, however, due to the COVID pandemic.

32. As the basis for his expected claim, Simonyan represented that he was experiencing a rare form of arthritis that resulted in his inability to perform five of the six ADLs defined in the Rider without Substantial Assistance.

33. He further represented during the claim assessment process that he was experiencing "15/10" pain and was effectively bedridden.

34. As a result, he contended he needed and received nearly round-the-clock care services in his home from his Spouse, Sevan Manougian ("Manougian").

35. On or about June 20, 2020, Simonyan formally opened a claim for benefits.

36. Simonyan was advised by Transamerica at or near that time that the claim could not be approved in its present state because Manougian was a member of

6

Simonyan's Immediate Family and, therefore, the services she allegedly provided were excluded from coverage.

37. Thereafter, Simonyan presented Transamerica with papers stating that he and Manougian were separated and had filed for divorce.

38. Upon information in and belief, this "paper divorce" was part and parcel of Simonyan's fraudulent scheme. It was a sham. Simonyan believed that if he were divorced from Manougian, she would cease to be a member of his Immediate Family and would be eligible to qualify as an approvable caregiver under the Rider so benefits could be paid.

39. As discussed below, however, Simonyan did not require nor actually receive care services from Manougian or anyone else. For the scheme to work, he needed Manougian to be an approvable caregiver because any honest, legitimate and/or professional caregiver would have immediately surmised the fraudulent nature of the claim and refused to participate; whereas Manougian, who stood to benefit from Transamerica's claim payments to Simonyan, was willing to go along with the scheme.

40. Notwithstanding that Simonyan and Manougian appear to have legally divorced at some point in 2021, they never stopped cohabitating nor holding themselves out in the community as husband and wife. Thus, even if they may no longer technically be "Spouses" under the Rider, they remain "Partners" and benefits for care services allegedly provided by Manougian are excluded from coverage.

### D. Transamerica's Claim Investigation

#### 1. Medical Records and Application Fraud

41. Transamerica obtained copies of Simonyan's medical records to evaluate the claim in accordance with its rights under the Rider. Those records were illuminating.

7

42. Some of the medical records went back in time several years before Simonyan applied for coverage with Transamerica and continued through the time period of the claim investigation.

43. The records established that Simonyan misrepresented material health-related facts in his applications for the Policy and Rider.

44. The very same arthritis-based complaints that gave rise to Simonyan's 2020 claim for benefits under the Rider were present in the records going back at least as far as 2015.

45. Indeed, Simonyan met with his doctor about these complaints *twice* in the month immediately preceding his application for coverage. Yet, despite these doctor visits – visits he could not possibly have "forgotten" when he applied for coverage – he answered all medical questions in the negative.

46. To be clear, nothing in the medical records establishes that Simonyan would have met the benefit eligibility triggers in the Rider at any time, past or present.

47. Transamerica, however, would not have issued the Policy and Rider without having asked additional questions and gathered additional information about Simonyan's health in order to determine whether he was, in fact, insurable. In other words, truthful answers on the applications would have prompted Transamerica to conduct a deeper underwriting investigation, following which coverage may have been declined.

48. Simonyan knew Transamerica may have declined to issue coverage if it had known the truth. It is for this reason that he knowingly and intentionally misrepresented facts in the applications.

49. Upon information and belief, Simonyan always knew and intended that he would initiate a claim for benefits under the coverage he obtained from Transamerica. His behavior in obtaining coverage fits the literal definition of "antiselection."

8

50. Upon information and belief, Simonyan also knew that on account of the Time Limit on Certain Defenses provision in the Rider, it could be more challenging for Transamerica to rescind coverage if it discovered his application fraud more than two years after the Rider was issued.

51. Thus, he waited until just more than two years after coverage was issued before initiating a claim for benefits under the Rider notwithstanding that his claim was always a *fait accompli*.

### 2. Weekly Proof of Loss Submissions to Transamerica

52. Simonyan was required to provide written Proof of Loss to Transamerica as one of the ongoing conditions of seeking benefits under the Rider. That is, he was required to submit a weekly form to Transamerica in which he provided information that would allow Transamerica to evaluate the nature and amount of benefits to pay in the event Simonyan met the Rider's benefit and provider eligibility requirements.

53. Simonyan was required to include a significant amount of detailed information in these weekly submissions. The information included, for instance, the identity of Simonyan's caregiver; the specific dates and times when care was allegedly provided; the caregiver's hourly billing rate; the specific nature of the care services provided; and the amount of money Simonyan actually paid the caregiver for care services received.

54. Moreover, every Proof of Loss form needed to be signed and certified by Simonyan and his alleged caregiver (Manougian) before it was submitted to Transamerica.

55. As discussed above, Simonyan's claim was not approvable because the care services he allegedly received were provided by Manougian – a member of his Immediate Family. Simonyan and Manougian nonetheless completed, signed, certified and submitted written Proof of Loss to Transamerica for hundreds of alleged dates of care services over the entire life of the claim.

56. Upon information and belief, these forms were submitted in the hope that when Simonyan's divorce from Manougian became final, Manougian would become an approvable caregiver and Simonyan's claim for benefits would be paid. In other words, all Proof of Loss was submitted for the purpose of cloaking the claim in legitimacy and inducing Transamerica to pay benefits to Simonyan.

57. Among a multitude of other representations, the weekly forms submitted by Simonyan and Manougian typically represented that Manougian provided paid care services to Simonyan in the home 18-19 hours per day, seven days per week. This equated to well over 100 hours of care services per week at an alleged cost of well over $1,500 per week.

### 3. Transamerica's Surveillance

58. Transamerica determined that it was necessary and appropriate to perform surveillance in support of its investigation.

59. Accordingly, between September 15, 2020 and April 6, 2021, Transamerica performed four periods of surveillance on Simonyan, totaling 20 surveillance dates. In order to better understand the nature and extent of the care services Simonyan claimed to be receiving, Transamerica also performed an additional two periods of surveillance on Manougian, totaling 12 surveillance dates. The results of this surveillance were astonishing.

60. Despite claiming to suffer from "15/10" pain and to be bedridden, to be unable to perform all six ADLs defined in the Rider without Substantial Assistance, and to need, receive and pay for nearly round-the-clock care from Manougian, the exact opposite was true.

61. Simonyan was seen active in the community on a daily basis. He was often alone for hours at a time. Indeed, he left the home alone for hours at a time. He had no functional limitations whatsoever. He drove a car. He shopped for groceries and other items. He carried heavy objects, including his young children. He went on family walks in the neighborhood. He barbecued in his driveway. He displayed a full

range of motion and absolutely normal strength and mobility. He used no medical implements like a cane or wheelchair, and did not walk with a limp or guarded gait. This pattern of totally uninhibited movement was consistent over all dates and periods of surveillance during Transamerica's investigation, with no exceptions whatsoever.

62. Manougian, like Simonyan, was also seen active in the community on a daily basis – sometimes alone and sometimes with Simonyan. Never once, however, was she seen providing care or assistance to Simonyan of any kind, because he clearly did not need it.

63. Due to the extent of Transamerica's surveillance activities, another pattern emerged. Not only did Simonyan not need or receive assistance of any kind from Manougian (or anyone else), but Simonyan and Manougian were consistently providing Transamerica with signed and certified Proof of Loss forms (as discussed above) in which they represented to Transamerica that Manougian was providing paid care services to Simonyan in their home when, in truth, this was a factual impossibility because one or the both of them was away from the home and they were not together, often for hours at a time.

64. Moreover, during all periods of surveillance, Manougian was seen running a daycare center for young children, ostensibly named Tiny Footsteps, from the home. Early each morning, parents would drop their children off at the home and would not retrieve those children until late afternoon or evening.

65. Manougian was not providing paid care services to Simonyan each day during these lengthy periods, as represented to Transamerica. She was providing paid care services to a large number of other people's young children.

66. In addition to revealing that Simonyan grossly misrepresented both his functionality and receipt of care services to Transamerica, Transamerica's surveillance also revealed that his divorce from Manougian was a sham. While possibly "official" from a legal standpoint, the divorce was undertaken for the singular purpose of attempting to enable Manougian to become an approvable caregiver under

the Rider so Simonyan could be paid benefits and the fraud against Transamerica could come to fruition.

67. In truth, Simonyan and Manougian still operate as a married couple hold themselves out in the community as husband and wife. They continue to live under the same roof. They co-parent their children. They go on family walks together. They attend events and socialize together. They drive each other's cars. They go shopping and run errands together. They remain "Partners" as defined in the Rider.

### 4. Independent Medical Examination

68. On October 22, 2020, while its investigation was ongoing, Transamerica sent Simonyan for an independent medical examination ("IME") in accordance with its contractual rights under the Rider. The IME was performed by Dr. Neil Ghodadra, who is board certified in orthopedic surgery and who had no prior relationship with Transamerica or Simonyan.

69. Simonyan presented for the IME being pushed in a wheelchair by a woman he described as his "assistant." Upon information and belief, the "assistant" was his wife, Manougian.

70. Simonyan represented to Dr. Ghodadra that he was functionally bedridden and, while he used to be able to ambulate with the use of a cane, he was now fully reliant on being pushed in a wheelchair.

71. Simonyan also represented during the IME that he was unable to perform all six ADLs without Substantial Assistance. He similarly reported being unable to stand for the examination and to experience severe pain with movement greater than five degrees in any direction.

72. On account of these subjective reports, Dr. Ghodadra deemed it appropriate to stop performing all physical testing during the examination.

73. Simonyan also admitted during the examination that his alleged physical ailments long predated his application for the Policy and Rider.

74. Because Dr. Ghodadra could not complete a physical examination of Simonyan, he opined based in large part on Simonyan's subjective reports and representations that Simonyan was unable to perform all six ADLs without Substantial Assistance.

### 5. IME Addendum

75. Simonyan's representations to Dr. Ghodadra, and Dr. Ghodadra's resulting opinions, were irreconcilable with Transamerica's surveillance video.

76. The surveillance video demonstrated not only that Simonyan was not bedridden, or in need of a cane or wheelchair, or in constant excruciating pain, or unable to move more than five degrees in any direction, but that he was fully independent and functional in every respect and was experiencing no limitation whatsoever. Moreover, Simonyan did not require the care of an "assistant" at any time, nor receive any such care.

77. Due to the significant disconnect between Simonyan's reported functionality and the surveillance video, Transamerica provided its video to Dr. Ghodadra so he would have all available information concerning Simonyan's functionality. Transamerica then asked Dr. Ghodadra whether the video changed his opinion in any respect.

78. Upon reviewing the video, Dr. Ghodadra changed his opinion entirely. He prepared a December 17, 2020 addendum to his initial IME report in which he observed:

> This man is fully functional. There are multiple instances where he is walking and getting in and out of a car without any difficulty. He is seen loading and unloading the vehicles. He is seen bending, stooping, lifting and carrying. He is seen walking normally around a store, on the street, and outside the house. There is no evidence of any wheelchair.
>
> ***
>
> He is fully functional and appears completely different than the individual I saw, given that he presented to my office in a wheelchair and was unable to move.

13

### 6. Transamerica Closes its Investigation

79. Based on all information in its possession, Transamerica closed its investigation and determined that Simonyan did, in fact, engage in fraud.

80. Through Transamerica's diligence, Transamerica intercepted Simonyan's fraudulent scheme before benefits were paid under the Rider. Transamerica was harmed nonetheless by Simonyan's fraudulent conduct. Transamerica has paid producer commissions for a policy tainted by fraud at the inception and spent tens of thousands of dollars investigating and redressing Simonyan's claim fraud including, *inter alia*, hiring private investigators, engaging counsel, and retaining a doctor to perform the IME, among other related expenses.

81. Simonyan's conduct was protracted and egregious, and was of a nature that it shocks the conscience and justifies punitive damages in addition to compensatory damages.

82. Moreover, Simonyan still holds the Policy plus a Trendsetter Intermediate Premium Term Life Insurance Policy, No. XXXXXX5018 (the "Life Policy;" together with the Policy, the "Policies"), that was issued on or about October 27, 2017. Simonyan has proven himself incapable of proceeding in good faith in an ongoing contractual relationship with Transamerica and, accordingly, Transamerica is entitled to a declaration that the Policies are void.

83. Thus, there is an actual, present and justiciable controversy between the parties for which there is no adequate remedy at law as to whether the Policies are void.

### COUNT I – FRAUD

84. Transamerica incorporates the preceding paragraphs of the complaint as though set forth fully herein.

85. Simonyan did knowingly and intentionally misrepresent, or cause to be misrepresented, material facts to Transamerica as described in this Complaint, in the following ways:

14

86. Creating and perpetuating the false impression that Manougian provided care to Simonyan on dates and at times when, in fact, no care was provided;

    a) Creating the impression that Simonyan was unable to perform two or more ADLs without substantial assistance when, in fact, he was fully capable of performing all ADLs;

    b) Creating and perpetuating the false impression that Simonyan's care needs were greater than they were in-fact;

    c) Creating and perpetuating the false impression that Manougian provided specific kinds of care services to Simonyan when, in fact, she did not do so;

    d) Creating and perpetuating the false impression that Simonyan compensated Manougian for her services in the amounts represented to Transamerica when, in fact, she was not compensated as represented to Transamerica, if at all.

    e) Creating and perpetuating the false impression that he and Manougian underwent a legitimate divorce when, in fact, their divorce, if any, was a sham designed merely to allow Manougian to become an eligible caregiver under the Rider so she could provide covered care in furtherance of the fraud;

    f) Creating and perpetuating the false impression that the information contained in the applications for the Policy and Rider was true and correct when, in fact, the applications included material misrepresentations, in order to be issued coverage that Transamerica would not have issued without additional investigation, if at all.

87. Simonyan made and perpetuated these misrepresentations repeatedly over a continuous period more than a year with knowledge of their falsity.

88. Simonyan made and perpetuated these misrepresentations with knowledge and intent that the false information would be relied upon by Transamerica for his benefit and to Transamerica's detriment.

89. Transamerica relied on Simonyan's misrepresentations and was justified in its reliance.

90. As a direct and proximate result of Defendants' fraudulent misrepresentations, Transamerica was harmed by issuing coverage tainted by fraud and incurring significant costs in connection with the same and its investigation of the fraudulent claim.

15

91. Transamerica incurred additional losses in an amount to be determined at trial.

## COUNT II – NEGLIGENCE

92. Transamerica incorporates the preceding paragraphs of the complaint as though set forth fully herein.

93. Simonyan had an ongoing duty to provide true and correct information to Transamerica concerning his applications for the Policy and Rider and claim including, but not limited to, his health and functionality, claim for benefits under the Rider, alleged receipt of care and alleged payment for the same.

94. By providing false information to Transamerica as described in this Complaint, Simonyan breached his duties to Transamerica.

95. Transamerica reasonably relied to its detriment on the false information supplied by Simonyan, issuing coverage he was not entitled to receive and expending its scarce human and financial resources to investigate and redress his fraudulent claim.

96. Thus, the false information supplied by Simonyan to Transamerica both caused and proximately caused harm to Transamerica in an amount to be determined at trial.

## COUNT III – DECLARATION THAT THE POLICIES ARE VOID OR RESCINDABLE

97. Transamerica incorporates the preceding paragraphs of the complaint as though set forth fully herein.

98. Insurance contracts are agreements *uberrimae fidei* and are undergirded by a mutual implied covenant of good faith and fair dealing.

99. By initiating and perpetuating a protracted fraud against Transamerica, Simonyan has breached the implied covenant and demonstrated that he is incapable of proceeding in good faith in an ongoing contractual relationship with Transamerica.

100. Accordingly, the Court should declare the Policies void in three respects.

101. First, it is necessary and appropriate for the Court to exercise its inherent power to adjust the equities between the parties by declaring the Policies void so Transamerica is not forced to remain in contractual privity with a party, Simonyan, who has acted in bad faith and may attempt to commit additional frauds against Transamerica in the future.

102. Second, it is necessary and appropriate for the Court exercise its equitable powers to declare the Policies void as a means of compensating Transamerica for a portion of the losses attributable to Simonyan's fraudulent conduct.

103. And, third, Transamerica is entitled to a declaration that the Policies are void under California black letter law, including:

   a) Cal. Civ. Code § 3412, due to Simonyan's fraud and, as a result, Transamerica's reasonable apprehension of serious injury, including additional pecuniary loss, or the prejudicial alteration of Transamerica's position, in the event Transamerica is required to remain in contractual privity with Simonyan;

   b) Cal. Civ. Code § 1689, because the Policies are unlawful for causes that do not appear in their terms or conditions; and because the public interest will be prejudiced by permitting the Policies to stand; and/or

   c) Cal. Ins. Code § 359, which requires the Policies to be voided as of the earliest date on which Simonyan misrepresented any material fact to Transamerica concerning the claim.

104. There is an actual, present and justiciable controversy between the parties as to whether the Policies are void for which there is no adequate remedy at law.

105. In the alternative, if the Court does not void one or both of the Policies as requested above, the Court should enter an order permitting Transamerica to rescind the Policies due to one or both of:

17

a) Simonyan's misrepresentation of material facts in the applications for coverage, and/or

b) Simonyan's material misrepresentations in the applications amounting to the failure of a condition precedent to one or both of the Policies taking effect in the first instance.

**WHEREFORE**, Transamerica respectfully demands the following relief:

1. Actual and compensatory damages in an amount to be determined at trial, plus interest;

2. Punitive damages;

3. Attorney's fees;

4. The costs of litigation;

5. A judicial declaration that the Policies are void;

6. A judicial declaration that Transamerica may retain some or all of the premium paid for the Policies;

7. Or, if the Policies are not declared void, a declaration that Transamerica may rescind the Policies;

8. Such other relief as may be demonstrated at trial; and

9. Such other relief as the Court deems just and proper.

DATED: 2/7/2022                    COZEN O' CONNOR

By: */s/ Valerie D. Rojas*
Valerie D. Rojas
Michael D. Rafalko (*Pro Hac Vice to be filed*)
Allison B. Goldis (*Pro Hac Vice to be filed*)

**Attorneys for Plaintiff
TRANSAMERICA LIFE INSURANCE COMPANY**